

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

October 23, 2019

**BY ECF**

Honorable Lorna G. Schofield
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Quentin Starkes*, S1 17 Cr. 610 (LGS)

Dear Judge Schofield:

      The defendant in this case, Quentin Starkes, is scheduled to be sentenced on October 31, 2019, having pled guilty, pursuant to a plea agreement, to (1) racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), and (2) narcotics conspiracy, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B).  The Government respectfully submits this letter in advance of the sentencing.

      In the plea agreement, the parties stipulated that the Guidelines range was 100 to 125 months' imprisonment (the "Stipulated Guidelines Range").  In its Presentence Investigation report ("PSR"), dated December 18, 2018, the Probation Department calculated a Guidelines Range of 188 to 235 months' imprisonment, based on a finding that the defendant is a career offender.  For the reasons explained in this letter, the Government believes a sentence within the Stipulated Guidelines Range is sufficient, but not greater than necessary, to account for the factors set forth in Title 18, United States Code, Section 3553(a).

## BACKGROUND

**A. Offense Conduct**

      In or about 2015, the Federal Bureau of Investigation ("FBI"), New York City Police Department ("NYPD"), and the Drug Enforcement Administration ("DEA") began investigating gang and drug activity in the Mill Brook Houses, a complex of residential buildings in the Southern Bronx bordered by East 135th Street to the South, East 137th Street to the North, Cypress Avenue to the East, and Brook Avenue to the West.  PSR ¶¶ 31-32.

Honorable Lorna G. Schofield
October 23, 2019
Page 2 of 5

The Mill Brook Houses are located on a hill, where the hill slopes from uphill in the East to downhill in the West.  For over a decade, two local gangs have operated in the vicinity of the Mill Brook Houses.   One gang, "MBG" (which stands for "Millbrook Gangstas" or "Money Bitches Guns") is composed primarily of individuals from the uphill section of the Millbrook Houses on Cypress Avenue in the South Bronx, which is colloquially referred to as "Millbrook Up" or "Up the Block."  Another gang, "Killbrook," is composed primarily of individuals from the downhill section of the Mill Brook Houses, which is referred to as "Down the Block" or "Millbrook Down."   Gang members show their affiliation with the gang through tattoos, gang signs, and by posting information about MBG and Killbrook on Facebook and Instagram.  PSR ¶ 32.

Members and associates of MBG and Killbrook include members and associates of other street gangs, including the "Young Gunnaz" ("YGz") and the G-Shine Bloods.  For example, several members of MBG are also members or associates of the broader YGz gang.  Similarly, several members of Killbrook are also members or associates of the G-Shine Bloods.  The majority of the attempted murders in Mill Brook over the past several years were driven by the perpetrator's affiliation with the Mill Brook-based gangs of MBG or Killbrook, although many were also related to the YGz.  PSR ¶ 33.

Since in or about 2007, the Mill Brook Houses in the NYPD's 40th Precinct in the South Bronx, New York have been the center of a violent feud between MBG and Killbrook.  The feud began in 2007, when Joey Colon, a/k/a "Joey," a member of MBG, shot Giovanny Eligio, a/k/a "Gio," a/k/a "Willow," who was from the downhill side of Millbrook.  The rivalry escalated from the end of 2009 through the beginning of 2010.  Most notably, during that time, there was a shootout at a baby shower in the community center of the Mill Brook houses, where Ramel Jackson, the defendant, opened fire at MBG members celebrating at the shower.  An innocent bystander, who was an MTA worker, was wounded by a stray bullet.  Later that evening, Michael White, a/k/a "Mike" shot Kaseem Cherry, a/k/a "Kas," a Killbrook member, in the back of the head.  PSR ¶ 34.

MBG and Killbrook members reached a truce in 2010, but it fell apart in 2011, when Gary Davis and Kareem Davis shot and killed Bolivia Beck, the girlfriend of Joey Colon, one of the core MBG members.  Numerous shootings followed the Beck murder, many of which were committed by Colon. In late 2011, Andre Cofield—one of the narcotics defendants in this case—brokered another truce between MBG and Killbrook.  Around 2013, the truce again fell apart, and the shootings and violence began anew in 2013 that year.  PSR ¶ 35.

In total, law enforcement has identified over 25 attempted murders involving MBG, the YGz, and Killbrook.  PSR ¶ 36.

In addition to attempted murders, members of Killbrook, MBG, and the YGz are engaged in narcotics trafficking—primarily involving crack cocaine, heroin, and marijuana—in the Mill

Brook houses. Money from narcotics trafficking is used to purchase guns and ammunition, among other items, that benefit the gangs. PSR ¶ 37.

Starkes directly participated in an act of violence as part of his membership in Killbrook: on May 1, 2017, he shot a rival gang member in the right bicep, causing serious bodily injury. PSR ¶ 61. He was also involved in the distribution of at least 28 grams, but less than 112 grams, of cocaine base. PSR ¶ 61.

### B. Relative Culpability

The Government views Gary Davis, Kareem Davis, Andrew Burrell, Jackson, and Quentin Starkes as differently situated than the narcotics-only defendants, since they were involved in violence. The Government views Starkes as somewhat similar to Andrew Burrell in terms of relative culpability. Although Starkes was involved in one shooting, rather than two like Burrell, Starkes hit his target, causing serious bodily injury. In contrast, no one was hit during Burrell's shootings. Like Burrell, Starkes was also involved in selling crack cocaine.

### C. The Presentence Investigation Report

On December 18, 2018, the Probation Department issued the PSR for Quentin Starkes in this case. The Probation Department calculates a Guidelines Range of 188 to 235 months' imprisonment. The Probation Department recommends a sentence of 188 months.

## ARGUMENT

### A. Applicable Law

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 55 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, see *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, see *id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, see *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).

Honorable Lorna G. Schofield
October 23, 2019
Page 4 of 5

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that the district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B. Discussion**

In this case, a sentence within the Stipulated Guidelines Range is appropriate.

First, as detailed above, the crimes committed by Quentin Starkes and other Killbrook members are extremely serious, and wreaked havoc on the Mill Brook Houses and its residents. Starkes in particular participated in a shooting as part of the gang war within the Mill Brook Houses, injuring a rival gang member. Starkes' shooting of a rival gang member in May 2017 – months before his arrest in this case – could have ended the victim's life had the bullet strayed a few inches in certain directions. In other words, it is sheer luck that Starkes has been convicted for his involvement in an attempted murder, rather than murder. Given the nature and circumstances of this shooting and the others, a Guidelines sentence is appropriate.

Second, a Guidelines sentence is necessary to deter the defendant and to protect the public from Starkes. As reflected by his criminal history, Starkes has regularly been involved in violence, including fights and robberies, since age 16. These violent actions continued through 2017, when he shot a rival gang member. A Guidelines sentence is necessary to deter Starkes and prevent him from resuming his dangerous behavior, until an age when the likelihood of his involvement in violent crimes is significantly reduced.

## CONCLUSION

For these reasons, the Government respectfully submits that a sentence within the Stipulated Guidelines Range is warranted for Quentin Starkes.

                Respectfully submitted,

                GEOFFREY S. BERMAN
                United States Attorney

By:       /s/
        Jordan Estes
        Alexandra Rothman
        Assistant United States Attorneys
        (212) 637-2543/2580

cc: Aaron Goldsmith, Esq. (via ECF)